# FILED

FEB 1 1 2019

TIMOTHY M. O'BRIEN CLERK
By_____ *OM* _____Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Scott B. Sullivan )
)
_____ )
)
(Enter above the full name of the Plaintiff(s) )
)
vs. )  Case Number $2:19\text{-}CV\text{-}2078\text{-}SAR\text{-}TJJ$
)
University of Kansas Hospital Authority,et. )
Name )
3901 Rainbow Blvd. )
Street and number )
Kansas City        KS         66160 )
City            State        ZipCode )

(Enter above the full name and address of the
Defendant in this action - list the name and
address of any additional defendants on the back
side of this sheet).

## CIVIL COMPLAINT

I.  Parties to this civil action:

(In item A below, place your name in the first blank and place your present address in the
second blank. Do the same for additional plaintiffs, if any, on the back side of this sheet).

A.  Name of plaintiff Scott B. Sullivan

Address 7214 W 71st Terrace

Overland Park, KS 66204

Telephone: (913) 265-5949

1

(In item B below, write the full name of the defendant in the first blank. In the second blank, write the official position of the defendant. Use item C for the names and positions of any additional defendants).

B.    Defendant University of Kansas Hospital Authority _____ is

       employed at _____

       _____

C.    Additional Defendants Dr. Larry Cordell - Assistant Professor, Physician

       University of Kansas Medical Center, 3901 Rainbow Blvd.

       Kansas City, KS 66160

II.    Jurisdiction:

       (Complete one or more of the following subparagraphs, A., B.1, B.2., or B.3., whichever is applicable.)

       A.  (If Applicable) Diversity of citizenship and amount:

            1.    Plaintiff is a citizen of the State of _____ Kansas _____ .

            2.    The first-named defendant above is either

                  a.   a citizen of the State of _____; or

                  b.   a corporation incorporated under the laws of the State of

                        _____ Kansas _____ and having its principal place of business

                        in a State other than the State of which plaintiff is a citizen.

       3. The second-named defendant above is either

                  a.   a citizen of the State of _____ Kansas _____; or

                  b.   a corporation incorporated under the laws of the State of

                        _____ and having its principal place of business in a

                        State other than the State of which plaintiff is a citizen.

       (If there are more than two defendants, set forth the foregoing information for each additional defendant on a separate page and attach it to this complaint.) Plaintiff states that the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

## ADDITIONAL PARTIES

**The University of Kansas Physicians**
2000 Olathe Blvd.
Kansas City, KS 66160
Telephone: 913-588-6800

and may be served via:
REGISTERED AGENT KANSAS, LTD.
10851 Mastin Boulevard Suite 1000
OVERLAND PARK, KS 66210

**Dr. Judson Bertsch, MD**
The University of Kansas Hospital
4000 Cambridge St - MS 4032
Kansas City, KS 66160

**Dr. Larry Cordell** - Assistant Professor
The University of Kansas Medical Center
3901 Rainbow Blvd.
Kansas City, KS 66160
Telephone: 913-588-5000

**Dr. Phillip Hylton** - Assistant Professor, Vice Chair  Clinical Affairs
The University of Kansas Medical Center
3901 Rainbow Blvd.
Kansas City, KS 66160
Telephone: 913-588-5000

**Dr. Tiffany Williams** - Former Assistant Professor, University of Kansas Medical Center
c/o eviCore Healthcare
730 Cool Springs Blvd., Suite 800,
Franklin, Tennessee 37067, US

**Dr. Mohsen Tahani** - Formerly of The University of Kansas Medical Center
c/o St. Mary's Pain Center
801 N.W. St. Mary Drive, Ste. 210
Blue Springs, MO 64014
Phone: (816) 655-5270
Fax: (816) 655-5395

**Mission Family Health Care**
6511 Johnson Dr,

Mission, KS 66202
Telephone: (913) 945-9680

**Dr. Bradley S. Jackson**
The University of Kansas Medical Center
3901 Rainbow Blvd.
Kansas City, KS 66160
Telephone: 913-588-5000

**Dr. Mark O. Scott, DO**
The University of Kansas Medical Center
3901 Rainbow Blvd.
Kansas City, KS 66160
Telephone: 913-588-5000

**Brandon Welsh, Resident Radiologist**
c/o Lee's Summit Medical Center
2100 SE Blue Parkway
Lee's Summit, MO 64063
Telephone: (816) 282-5000

**John Leever, Radiology**
The University of Kansas Hospital
4000 Cambridge St MS 4032
Kansas City, KS 66160

**Neurosurgery of South Kansas City**
5340 College Blvd.
Overland Park, KS 66211
Phone: (816) 942-0200

**Dr. John Clough**
5340 College Blvd.
Overland Park, KS 66211
Phone: (816) 942-0200

**Ellen Kay Carpenter, NP**
5340 College Blvd.
Overland Park, KS 66211
Phone: (816) 942-0200

B.    (If applicable)  Jurisdiction founded on grounds other than diversity
(Check any of the following which apply to this case).

☐    1.    This case arises under the following section of the Constitution of
the United States or statute of the United States (28 U.S.C. §1331):
Constitution, Article_____, Section_____;
Statute, US Code, Title_____, Section_____.

☑    2.    This case arises because of violation of the civil or equal rights,
privileges, or immunities accorded to citizens of, or persons within
the jurisdiction of, the United States (28 U.S.C. §1343).

☑    3.    Other grounds (specify and state any statute which gives rise to such
grounds):

Medical Malpractice, Kansas Consumer Protectio

Act, Breech of Contract, Libel, Slander, Intentional

/ Negligent Infliction of Mental Anguish and

emotional distress,

III.    Statement of Claim:

(State here a short and plain statement of the claim showing that plaintiff is entitled to
relief.  State what each defendant did that violated the right(s) of the plaintiff, including
dates and places of such conduct by the defendant(s).  Do not set forth legal arguments.
If you intend to allege more than one claim, number and set forth each claim in a separate
paragraph.  Attach an additional sheet, if necessary, to set forth a short and plain statement
of the claim[s].)

1. Tarlov Cyst Disease is considered a "rare" congenital connective tissue disord

er, though statistically it is closer to an epidemic. 5% to 9% of the general popula

tion is affected by TCD; 1% to 2% of the population is symptomatic. Health care

providers nationwide refuse to diagnose and treat Tarlov Cyst Disease -- either

because of ignorance of the disease or for business reasons (liability limitation).

IV.    Relief:

(State briefly exactly what judgement or relief you want from the Court.  Do not make
legal arguments.)

3

2. The University of Kansas Medical Center, (hereinafter, "KU Medical Center") is
   uniquely situated to provide care to those who suffer from Tarlov Cyst Disease; both
   because KU Med Center has some of the nation's premier spine care facilities and
   personnel; and because The University of Kansas Hospital Authority (which
   operates The University of Kansas Medical Center) has unique statutory mandates
   of particular relevance to those with Tarlov Cyst Disease.

3. Persons with Tarlov Cyst Disease are uniquely and disproportionately
   disenfranchised from access to medical care for a variety of reasons: among those
   being (without limitation): wide-spread lack of knowledge of Tarlov Cyst Disease; the
   wide-spread unavailability within the private sector of specialized care for persons
   with Tarlov Cyst Disease; long-term disability and unemployment resulting from the
   lack of medical care; disenfranchisement  due to misdiagnosis from disability
   benefits, Medicaid benefits (KanCare), and subsidized health insurance; and the
   lack proper training and continuing education regarding Tarlov Cyst Disease which is
   necessary to address the medical *and* psychosocial needs of victims of this disease.

4. Exhibit 1 attached below, is Kansas Statute K.S.A. 76-3302 Titled "UNIVERSITY OF
   KANSAS HOSPITAL AUTHORITY: Findings, Purpose", included in its entirety as the
   entire "Findings, Purpose" section of the statute is relevant to the case: particularly
   those sections which address:

   a. "specialty patient services" and "specialized services not widely available
      elsewhere within the State";

   b. providing "education and training of health care professionals";

   c. providing "care...to medically indigent citizens of Kansas".

5. The physicians and staff of The University of Kansas medical center also played a significant role in obstructing my personal access to medical care by ignoring my physical symptoms, by withholding from me the fact of the presence of Tarlov Cysts and Tarlov Cyst Disease, by presuming me to be an opiod drug seeker, by presuming my symptoms to be exaggerated or falsified, and by refusing to perform MRI evaluation according to the specific instructions provided by Rita Honey-Heir of The Tarlov Cyst Foundation, and by refusing to participate in my then pending worker's compensation case.

6. I am alleging that the actions (and failures to act properly) of the physicians and staff of The University of Kansas Medical Center, Medical School, and affiliated physicians and satellite locations are the result of personal and institutional political opposition to The Worker's Compensation Act, to subsidized health care via The Affordable Care Act, To Medicaid / KanCare,  to disability benefits both public and private; and that the procedures and practices of The University of Kansas Medical Center are informed and established by paranoia over "The Opiod Drug War," paranoia and political ideologies relative to tort reform and medical malpractice litigation; and by opposition to and denial of The University of Kansas Hospital Authority's, Medical Center's, and Medical Schools' status as State institution as defined in K.S.A. 76-3302 et. seq.

## FACTUAL BACKGROUND

7. My name is Scott Sullivan.

8. I have Tarlov Cyst Disease.

9. I was first diagnosed with Tarlov Cyst Disease on October 15th, 2015 by Menorah Medical Center as a part of emergency room services to address a severe escalation of my symptoms.

10. However, due to the failure of all radiologists participating in my care to report the specific number, sizes, and locations of my multiple Tarlov Cysts, I am as yet unable to ascertain these critical facts necessary to further pursue health care and all other legal rights to relief. I am alleging this as active concealment; and as an industry wide practice of active concealment of Tarlov Cyst Disease, motivated by business decisions regarding the compensability and risks involved with the treatment of Tarlov Cyst Disease, and inconsistent with all modern medical science regarding this disease.

11. My symptoms have escalated gradually over the course of seven years; originating with a lumbar strain and herniated disc which occurred as the result of a work-place injury on January 9th, 2012.

12. My neurological symptoms began to prevail over muscular-skeletal pain by March of 2012; as is expected due to the relatively rapid healing of muscular pain (relative to nerve damage, nerve sheath damage, and Tarlov Cyst formation). My first neurological symptoms to arise which indicated the likelihood of nerve damage or impingement were a stinging pain in my left hip and restless leg syndrome -- which were reported to Doctors Stephen Nolker of St. Luke's South Primary (my private physician) and Doctor Tegumsen Wakwaya of Concentra (the physician and practice selected by my employer, OnForce; and their insurer or record, The Hartford)

13. The earliest MRI results provided by Johnson County Imaging on April 3rd, 2012 indicated herniated disks at L4-L5 and L5-S1. These became the focus of my attempts to access medical care from April of 2012 through October 15th, 2015; when the Tarlov Cysts by Menorah Medical Center.

14. Neither that MRI nor any subsequent MRI has provided specific diagnostic information regarding the number, size, and location of my cysts -- information which is necessary for proper diagnosis, in order to correlate the patient's reported symptoms to the myotomes at which the cysts are located; and to establish whether the symptoms are caused by pressure upon adjacent nerve roots, or by the dilation of cysts within the foramina, thus binding and stretching the nerve fibers contained therein.

15. Over the course of seven years, my symptoms have escalated; and have escalated upon a trajectory perfectly consistent with the experience reported by persons with Symptomatic Tarlov Cysts; and consistent with all published literature, case studies, and even textbook definitions of Tarlov Cysts and Tarlov Cyst Disease.

16. At the present time, I am unable to sit for extended periods of time -- including unable to sit upright on a couch typing for more than forty minutes to an hour. When I push myself beyond this limit, the gradual escalation of my "back pain" culminates in intense, **acute** stabbing pains in the lower spine and sacrum, accompanied by leg spasms, pelvic spasms, and stabbing pains through the genitals and rectum.

17. These symptoms of pain and neuropathy are also accompanied by frightening "stroke-like" symptoms attributable to cerebral spinal fluid hypotension or leakage: intense, sudden, sharply located headaches in the temples which doctors have

termed "Thunderclap Headaches", pain and pressure in the eyes, ears and sinuses; and recurring ringing in the ears, blurred vision, and ear popping which occasionally have escalated to momentary deafness, blindness, dizziness, vomiting, and falling; often accompanied by loss of bowel control and occasionally by loss of bladder control.

18. I had no prior history of chronic back pain, neuropathy, or weakness; and was in fact a relatively strong man; employed in the Information Technology sector, primarily providing infrastructure installation and maintenance services (systems, networks, and cabling) -- a very physically demanding, "blue collar" field of work.

19. I also suffer severe anxiety, fear and depression. It is difficult enough that I am unable to type more than two to three pages without succumbing to unbearable pain; when my only future hopes for medical care or recovery rest with successful litigation.

20. Countless efforts to retain legal representation (over 100 attorneys contacted) have resulted in only a few unproductive, allegedly unconscionable, and likely illegal (as described briefly below) offers of legal representation; with the vast majority of attorneys consulted expressing the opinion that my claims are too extensive, too complex, would be too costly to pursue, and would be difficult to prevail upon, particularly in light of the "controversial" nature of Tarlov Cyst Disease and the complete lack of medical experts in The State of Kansas willing to testify regarding the current scientific understanding of these cysts and this disease.

21. Of relevant note, Dr. Paul Arnold -- former director of The University of Kansas Hospital's Marc A. Asher, MD, Comprehensive Spine Center published a case study

entitled " Marfan syndrome and symptomatic sacral cyst: Report of two cases" in The Journal of Spinal Cord Medicine in September of 2013.

22. Additionally, during my initial consultation with Dr. Phillip Hylton at the Comprehensive Spine Center, he identified sacral pain and instability, which he presumed to be the result of ligament damage; and recommended Proliferative Therapy while noting that the University of Kansas Hospital would not perform "prolo-therapy" due to its experimental nature and hospital policies against experimental procedures. This is alleged to contradict both the statutory mandates for the University of Kansas Hospital Authority; and is alleged to have been a deceptive and unconscionable statement and practice; contradicted by Dr. Arnold's treatment of sacral cysts reported in the aforementioned study.

23. My legal and medical challenges and the resultant stress and anxiety disorders are aggravated constant pain, escalating pain, escalating neurological symptoms, by the emergence of new neurological symptoms; and by the burdens of perfectionism which have been imposed upon me through four years of litigation abuse (worker's compensation, debt collections, and property maintenance violations); and an additional three years of attempting unsuccessfully to resolve my barriers to access to medical care without resort to litigation.

24. I was tentatively diagnosed with Legal Abuse Syndrome in 2014 subsequent to a telephone consultation with Karin Huffer,(now deceased); a particular and now codified (as of DSM-V) form of post-traumatic stress disorder; which manifests itself every time that I attempt to write the legal pleadings which I believe will be necessary not only to secure health care services; but ultimately to save my life.

25. All efforts to resolve my issues regarding access to medical care, adherence to the many relevant contracts, and acknowledgement of my pain, neurological dysfunction, and disability without resort to litigation have been completely unsuccessfully. including all disputes (including medical / scientific disputes) regarding Tarlov Cyst Disease. The more that I try to reason with people, the more abusive they become; to the effect that I am not only physically disabled with crippling pain, but also emotionally and psychologically scarred, to the effect that reviewing documentation, remembering specific events and encounters, and attempting to record these in legally cognizable pleadings often brings me to the point of tears; and always presents a barrier to the completion of even the simplest of tasks I have documented this fact thoroughly, and the effects of litigation abuse, denials of medical care, my escalating disability and emotional instability were the cumulative reasons for the dissolution of my .relationship with Michelle Safford, which we both openly and consistently affirmed to be a common law marriage -- a fact which is even recorded repeatedly within my medical records.

26. The very prospect of litigation terrifies me; and I have received both threats and warnings; and been the victim of physical assaults,  verbal assaults, vandalism, extortion, and even blackmail; often with the explicit demand that I surrender all of my rights to medical care and to any benefits which I may have had under The Worker's Compensation Act, under the contract with OnForce (see below), and under my contracts for health insurance and health care services.. I am terrified to the point of near catatonia every time that I try to write a pleading; and certain that the effects will be apparent to anyone who reads them.

27. I was injured at work on January 9th, 2012. I suffered a back-injury while working as an independent contractor for a company called Agilisys, at the Oak Park Mall location of the international retailer Talbot's, under a contract facilitated via an online "Workforce Management Platform" operated by a Massachusetts corporation called OnForce (which has since been sold twice); under a contract executed between myself and Agilisys via the OnForce.com platform for one half day of labor; and under a contract for the use of the OnForce.com "Workforce Management Platform" which included charges (totaling 4.9% per work order) so that all work orders contracted and performed via the OnForce.com platform would be covered under OnForce's corporate insurance policies for worker's compensation, errors and omissions, and general liability.

28. OnForce was not authorized by their insurance provider -- initially advertised as "The Hartford," but subsequently revealed to be "Twin Cities Fire Insurance" to offer worker's compensation benefits to contractors utilizing their platform; and does not appear to have purchased insurance to cover the more than 10,000 independent contractors utilizing their services as Service Providers (such as myself), nor to cover incidents occurring under contract and on the premises of Service Buyers (such as Talbot's).

29. OnForce's practice of charging fees for worker's compensation coverage was confirmed by the Department of Labor's Worker's Compensation Division, by The Kansas Insurance Commission, and by the opinions of countless attorneys to be in violation of K.S.A. 44-5,120(d)(1); and that the subsequent actions of both OnForce and their insurers and agents in the processing of my claim via the Kansas

Department of Labor Division of Worker's Compensation would likely constitute violations of numerous other Federal and State statutes as well.

30. Rather, OnForce appears to have merely purchased worker's compensation insurance to cover their 50 internal employees, plus "Employment Practices Liability" insurance -- which is presumed to be the policy under which The Hartford elected to process my claim through their worker's compensation claims offices; and ultimately through the Kansas Department of Labor's Division of Worker's Compensation.

31. Documents provided to me by attorney Melinda Young, who represented me briefly in 2014 listed OnForce's worker's compensation policy as underwritten by The Hartford, with policy number "75POLDUMMY".

32. However, "The Hartford" refused to provide confirmation or supporting documentation; and processed my claim as if I were insured under a legally binding worker's compensation policy; and my attorney, rather than filing fraud claims against OnForce and The Hartford, opted to withdraw from the case; then after filing for leave to withdraw, filed a Motion for Preliminary Hearing with the Division of Worker['s Compensation, provided me with no notice of the filing, and attached no documentation nor requests for benefits to her filing.

33. I had been insured under a private health care policy by Coventry since January 1st, 2012; and had been insured by Blue Cross and Blue Shield prior to Coventry since 2006; and was prevented from accessing benefits under my health insurance policy from Coventry due to the legal disputes regarding my worker's compensation / OnForce insurance and failure to properly diagnose and treat my Tarlov Cysts and Tarlov Cyst Disease.

34. I was subsequently prevented from accessing benefits under health insurance policies underwritten by Blue Cross and Blue Shield and by United Health Care due to the refusals of The University of Kansas Hospital and of Neurosurgery of South Kansas City to properly diagnose or treat Tarlov Cysts and Tarlov Cyst Disease.

35. Every single attorney with whom I have consulted has stated that the case was simply too complex to litigate; and thus I was forced to seek medical care through my own doctors and private health care insurance, and through OnForce via worker's compensation; as multiple health care providers refused to provide me with medical care for my injury on the basis that I had been injured at work, they presumed that I was covered under worker's compensation, and they did not want to provide services under the worker's compensation act.

36. The health care providers who declined to provide services under the Worker's Compensation Act included St. Luke's South Hospital, St. Luke's Primary Care (Dr. Stephen Nolker), Shawnee Mission Medical Center, Shawnee Mission Primary Care (Dr. Gregory Sweat), Neurosurgery Associates (Dr. Steven Hess), as well as The University of Kansas Medical Center -- Doctors Phillip Hylton, Tiffany Williams, and Larry Cordell.

37. Additionally, I had several emergency room visits -- all of which focused only upon my apparent chronic back pain and suspected opiod drug seeking behavior; and examinations with multiple primary care physicians; the majority of whom would accept my appointments, evaluate me for anything *not* related to my spinal injury (such as colds, apparent sinus infections, cuts and scrapes from falling), but who would refuse to examine my back specifically, or to assess the impact of my spinal

injury and Tarlov Cyst diagnosis as the likely cause of the other symptoms which I was experiencing.

38. The reason for the earlier denials of medical care were often stated as "failure to pay for services rendered"; including refusals by my private health insurance provider, Coventry, and refusals by OnForce's alleged worker's compensation insurer, The Hartford.

39. Coventry repeatedly denied payments of benefits: citing to my health care providers alternating reasons of pre-existing condition exclusions, and subrogation to OnForce's worker's compensation insurers -- despite the fact that subrogation clauses are prohibited in health care policies under Kansas law.

40. When contacted, Coventry denied their refusal to pay benefits, and claimed that my policy was not "fully insured," despite the fact that my medical billing records indicated Coventry's denials; and my insurance Proof of Coverage specifically included the words "Fully Insured."

41. In addition, The Hartford (in the presumptive role of third-party claims administrator for Twin Cities Fire Insurance) repeatedly denied payments to my chosen providers physicians (including those at The University of Kansas Medical Center) which were requested under the statutorily mandated $500 "Non-Authorized" stipend; and would also deny payments to health care providers whom they selected: including both Dr. David Clymer of Carondolet (now Apex) and Dr. Edward Prostic of Mid-America Orthopedic.

42. At all times I was forthright and upfront with all of my health care providers; informing them of the complications regarding my worker's compensation claim, the fact that I

was a victim of insurance fraud, and the difficulty that I was having obtaining

counsel; with varied responses from health care providers. The physicians at The

University of Kansas -- beginning with Dr. Bradley Jackson in the emergency room

on April 4th, 2014; and continuing with Doctors Tiffany Williams, Phillip Hylton, and

Larry Cordell-- all attributed my belief that I was a victim of fraud to mental illness;

and subsequently attributed all of my symptoms to mental illness -- a fact which is

the common experience of literally 100% of people with Tarlov Cyst Disease.

### HISTORY OF MEDICAL CARE AND DENIALS OF SERVICE

43. St. Luke's South was the first to provide me with medical care, and ultimately to deny
    me medical services, subsequent to my injury on January 9th, 2012. Both via the
    emergency room and via St. Luke's Primary Care; though they confirmed my injury,
    disability, and symptoms. Dr. Bonness (St. Luke's ER) specifically informed me that I
    would "have to go through work comp" to get medical care; which prompted the
    opening of a claim via OnForce.

44. OnForce opened a claim, and initially sent me to Dr. Tegumsen Wakwaya at
    Concentra, who provided a single evaluation, and instructed me that I would have to
    follow up with my primary care physician, as The Hartford had approved me for
    "**ONE VISIT ONLY**" (The actual way in which it is recorded in my medical records at
    Coventry.)

45. Dr. Stephen Nolker (St. Luke's Primary) initially accepted me as a patient; and
    initially attempted to provide medical care for my spine, despite the fact that he was
    aware that I had been injured at work; because he understood that I was an
    independent contractor, and that I had contacted multiple attorneys by that point,

several of whom questioned whether or not I was legally subject to the worker's compensation act. Dr. Nolker, who had a long professional relationship with Michelle Safford as her primary care physician; understood the complications of my insurance situation, and was fully aware of the reality of my symptoms; even suggesting "piriformis syndrome" as a likely diagnosis of my radicular neuropathy.

46. Tarlov Cysts affecting the sacral nerve roots are known to cause symptoms identical to "piriformis syndrome" -- which is a compression of the sciatic nerve by the piriformis muscles.

47. Dr. Nolker attempted to order an MRI of my spine in March of 2012  His requests for MRI authorization were denied by Coventry.

48. A second visit with Dr. Wakwaya was finally approved for March 28th, 2012 by The Hartford; and an MRI was ordered and performed by Johnson County Imaging on April 3rd, 2012. No mention of Tarlov Cysts was included in Johnson County Imaging's written results.

49. I had these results forwarded both to Dr. Wakwaya (Concentra) and to Dr. Nolker; who was apparently then fired from his position at St. Luke's Primary for having involved himself in a worker's compensation case. This latter allegation is admittedly an inference  (with respect for the reason for Dr. Nolker's termination;)  based upon the scheduling nurse screaming into the phone "GO CALL WORK COMP" and hanging up when I attempted to schedule a follow up visit; followed shortly thereafter by my wife's son, Jonathan Keck II, receiving a form-mailed notice that Dr. Nolker was no longer with St. Luke's Primary; though both my wife (Michelle Safford) and I were omitted from the mailing list.

50. The Hartford approved a third visit with Dr. Wakwaya to review the MRI results, at which time he informed me that the MRI had revealed two herniated disks; and I was referred to Dr. John Ciccarelli at Premier Spine Care for further diagnostics and treatment.

51. In July of 2012, Dr. John Ciccarelli -- who had been providing me with medical care under agreement with The Hartford -- cancelled my upcoming physical therapy and requested approval for a discectomy / lamenectomy to be performed in August of 2012. At no point did Dr. Ciccarelli express any doubt regarding the genuineness or extent of my pain and neurological symptoms.

52. The Hartford declined approval for the surgery requested by Dr. Ciccarelli on August 15th, 2012 and again on August 22nd, 2012; then suddenly and unexpectedly cancelled my claim and closed my case file on September 11th, 2012, citing failure to attend the pre-surgery labs for the surgery which they had twice denied.

53. This began another gap in my medical care for the next four months, while I attempted to retain counsel.

54. On August 29th,  2012, attorney Zack Kulich agreed to accept my case for approximately five minutes. As I was reading the contract for representation, he was further reviewing my contract with OnForce. He then literally reached across the table and pulled the contract out from under my pen, and stated that he could not represent me. He sent me a certified letter the following day confirming that he had declined representation.

55. In October of 2012, I again suffered what I believed to be stroke-like symptoms (which have subsequently been identified as likely attributable to cerebral spinal fluid

hypotension caused by the dilation or leakage of Tarlov Cysts) and was admitted to the Shawnee Mission Medical Center Critical Cardiac Care unit for three days of evaluation and testing. All of the cardiac tests turned up negative; and during the entire course of my stay, doctors refused to look at or evaluate my spinal condition. I was however, required to take a heart stress test; and the doctors utilized a radioactive injection rather than a treadmill stress test; as they were aware that I was unable to walk sufficiently to complete the stress test via physical exertion.

56. Shortly after the Shawnee Mission Medical Center Critical Cardiac Care stay; attorney Michael Downing agreed to contact The Hartford unofficially  "to see what was going on." He responded to me that he could get me health care, but not worker's compensation benefits, and declined to represent me with respect to the frauds being committed by OnForce and The Hartford.

57. The Hartford did reopen my claim however, and approved me for $500 in "Non-Authorized Medical Expenses" to seek a second opinion regarding the surgical option recommended by Dr. John Ciccarelli.

58. I then established care with Dr. Gregory Sweat at Shawnee Mission Primary Care; but The Hartford refused to release funds to Dr. Hess or to Shawnee Mission Medical Center for their diagnostics and consultations.

59. Dr. Gregory Sweat at Shawnee Mission Primary Care agreed to accept me as a patient in December of 2012; and, being fully informed of the legal circumstances regarding my insurance, evaluated me and referred me to Dr. Stephen Hess at Neurosurgery Associates for evaluation of my injury and recommendations for care.

60. Dr. Hess, like Dr. Nolker, confirmed my symptoms and began evaluations for treatment, ultimately recommending disc fusion and ordering a myelogram and discography which were performed at Shawnee Mission Medical Center in January of 2013. Dr. Hess, however, became irate with me when he was informed by Coventry that they were subrogating to worker's compensation; until he realized that I had informed his staff in advance of the complications involving my worker's compensation and insurance claims. At no point, however, did Dr. Hess nor any of the other doctors involved in my care at Shawnee Mission Medical Center and Neurosurgery Associates mention Tarlov Cysts or Tarlov Cyst Disease.

61. Shortly thereafter both Shawnee Mission Primary Care and Neurosurgery Associates declined to provide any further services, citing non-payment of prior outstanding balances; including the refusal of The Hartford to release any of the non-authorized funds.

62. In January of 2013, attorney Michael Haight agreed to take my case, advising that he would pursue a legal strategy in which he would allege that I was the employer under The Kansas Worker's Compensation Act, so that I would have control over choice of physician and work restrictions. I was uncomfortable with this strategy, in particular because I was not the insured under any worker's compensation policy, and had not filed a form KWC-113 Election to come under the worker's compensation act. I contacted Mr. Haight the following day to ask that he obtain copies of all relevant insurance policies from OnForce and The Hartford and to evaluate the fraud claims, rather than to keep me "trapped" within the worker's compensation system. He refused to follow such a strategy, insisted that the

contracts for insurance were irrelevant and unnecessary; and I elected not to retain him as counsel any further.

63. This began yet another 15 months of delays in my medical care until April 8th, 2014; when I first attended The University of Kansas Emergency room

64. In the interim, in December of 2013, with less than two weeks remaining within the two year statutes of limitations for a worker's compensation claim, having received no substantial medical care nor any benefits from OnForce or The Hartford, and having received no medical care at all for nearly a year; I agreed to accept representation from the law firm of Bretz & Young; who filed a claim with the Kansas Department of Labor, Worker's Compensation Division; but were unable to get The Hartford or OnForce to approve either medical care or benefits during the first five months of their representation.

65. It is important to note that, up to this point, from January 9th, 2012 through March of 2014, not one doctor had expressed the opinion that I was exaggerating, faking, or imagining my symptoms; and all medical care provided had been focused upon the still untreated herniated disc; and the presumed cardiac cause of my stroke-like symptoms; with no mention or evaluation regarding Tarlov Cysts or other neurological causes to my symptoms.

66. I would not discover that I had Tarlov Cysts until October 15th, 2015; when the cysts were identified on an MRI performed at Menorah Medical Center during an emergency room visit for uncontrollable leg spasms, momentary blindness, dizziness, and falling.

67. On April 8th, 2014, while preparing for an appearance in a debt collections case docketed at The Johnson County Kansas District Court; I suffered extreme ringing in my ears, temporary total deafness in my left ear, extreme pressure in my sinuses, and near-blackout blurred vision; which prompted me to go to the Emergency Room at the University of Kansas Medical Center. It was my belief that these symptoms were caused by a severe sinus infection.

68. Upon arrival at the University of Kansas Emergency Room, Dr. Bradley Jackson and the medical staff focused upon my back pain; as it was clear that I was experiencing extreme pain and distress. My presumed sinus and ear infections were essentially ignored; and I was given a pain patch and injection and placed at "Station 19" - a corner of the common area of the emergency room adjacent to the nurse's station with no barrier or privacy.

69. When I explained that my back pain was the result of a work injury sustained more than two years earlier; and that my surgery had been cancelled a year and a half earlier due to irregularities and suspected fraud by my employer and insurer; Dr. Jackson responded "Nothing takes a year and a half" and walked away.

70. After more than five hours of "observation" I demanded to speak with a doctor, and Dr. Jackson returned with his supervising physician, Dr. Robert Scott. When I explained again that I had been injured two years earlier and that I had been recommended for surgery more than a year and a half earlier, Dr. Scott ordered a new MRI.

71. At that time, no mention was made of Tarlov Cysts, and I was discharged from the Emergency Department with the comment that if I wanted narcotic drugs, I would have to follow up with a pain management specialist.

72. To reiterate, I never wanted narcotic drugs; and had only gone to the ER on April 8th, 2014 due to deafness, dizziness, and what I presumed to be an extreme sinus infection. The presumption that I was seeking drugs was purely based upon the fact that I have undeniable evidence of pain and disability, which some doctors presume to be signs of drug seeking behavior. and it is this presumption which results in the vast majority of negligent and abusive medical care received by people with Tarlov Cyst Disease.

73. I subsequently followed up with Dr. Johnson at Sunflower clinic in Kansas City, KS who provided treatment for the presumed sinus infection; and scheduled a follow up with Dr. Tiffany Williams at The University of Kansas for my back pain and neuropathy, and to secure a referral with a neurosurgeon at the Asher Comprehensive Spine Care Center.

74. On April 14th, 2014; I attended an examination at the office of Dr. Williams which was performed by Dr. Mohsen Tahani. During that examination, while Dr. Tahani was performing a pendulum test on my right leg, I experienced an extreme stabbing pain through the length of my penis. This was the first time that I experienced the genital or rectal symptoms; and Dr. Tahani immediately ceased his examination and went to get Dr. Williams.

75. Dr. Williams entered the room and asked me several questions in a very aggressive and abusive manner. Specifically she asked why I had not accepted the surgery

from Dr. Ciccarelli in August of 2012; and when I explained that I had not refused surgery but that the surgery was denied, she asked "Well what do you want me to do?" I explained that I wanted a surgical consultation, and she said that I would have to call scheduling, that there was nothing that she could do, and then she stood up and exited the room abruptly.

76. I contacted the University of Kansas scheduling department and explained what had happened during my examination by Dr. Tahani and the subsequent "consultation" with Dr. Williams; and they agreed to schedule a visit with Dr. Phillip Hylton at the Comprehensive Spine Center for a Neurosurgical consultation.

77. I attended the examination with Dr. Hylton on April 23rd, 2014; and found him to be pleasant and professional. He did a cursory review of my MRI films (which I had previously obtained from Dr. Ciccarelli)  and suggested that my symptoms might be caused by torn ligaments; recommending Dr. Reeves of The Cleveland clinic for proliferative therapy. Dr. Hylton made no mention of Tarlov Cysts; but did mention that The University of Kansas prohibited him from officially recommending or performing proliferative therapy as it was considered an "experimental" treatment for torn or damaged ligaments.

78. Shortly after my examinations at The University of Kansas, my attorney, Melinda Young filed her Motion to Withdraw from my worker's compensation claim -- leading to several months of additional delays and litigation; ultimately resulting in The Hartford approving 12 sessions of physical therapy with Dr. Estaban Azevedo of Modern Physical Therapy.

79. Dr. Azevedo estimated my disability in excess of 82%; and after six weeks / twelve sessions of physical therapy commented that I "may never work again." Dr. Azevedo was the only doctor to ever spend more than 30 minutes observing me in physical activity; but he had no way of knowing that my symptoms were the result of Tarlov Cysts or Tarlov Cyst Disease.

80. Subsequent to my visit with Dr. Azevedo, I requested a second visit with Dr. Hylton at The University of Kansas. During this second visit, Dr. Hylton was not as pleasant (though he was not abusive, per se); and he explained that he did not want to be involved in a worker's compensation claims; and that none of the doctors at the University wanted to be involved in worker's compensation. He also specifically noted that Dr. Tiffany Williams was one of the doctors whom the university had hired specifically to handle worker's compensation workloads but the she simply did not want to do it.

81. Dr. Hylton's written report however was much more abusive; and I am alleging that it crosses the line to libel, intentional malpractice, deceptive and unconscionable acts, breech of contract and breech of the statutory mandates of K.S.A. 76-3302. In his written report, Dr. Hylton gives the impression that he performed an examination; and in fact I was billed for an examination; when in fact the entire conversation consisted of his explanations for why he would not perform an examination -- specifically that it was "about payment for services rendered" and his desire not to participate in worker's compensation cases.

82. I contacted The University again, and spoke with several people specifically in charge of handling worker's compensation claims; most notably Becky Moberg.

83. I worked extensively with Ms. Moberg to confirm the availability of the $500 non-authorized funds via The Hartford; and to select a physician who would perform services under the Worker's Compensation Act. It was Ms. Moberg who selected Dr. Larry Cordell, and eventually scheduled an examination for March 10th, 2015.

84. My examination with Dr. Cordell would be the most abusive and negligent examination performed by any doctor to date.

85. Though Dr. Cordell was instructed to review my existing records, including my existing MRIs, and was specifically informed that I had radicular neuropathy; he ordered a series of X-rays to be performed in a standing position. I was asked to walk more than 100 yards to the X-Ray room, was ordered to stand for the taking of five X-Rays; and I literally collapsed to the floor after the fourth X-Ray; after which a wheelchair was provided for the remainder of my visit.

86. Dr. Cordell asked a series of questions and performed a series of tests; repeatedly interrupting me and raising his voice. These tests included Waddell tests (tests intended to identify "non-organic" i.e. fake or psychologically caused indicators of pain); and included having me walk back and forth repeatedly until I again collapsed to the floor; at one point saying to me "You're not done yet" and forcing me to continue. He then stated that he thought that my pain was "out of proportion" to the findings of my X-Rays, and he refused to review the MRI imagery to see if there were any unnoticed neurological causes to explain my symptoms.

87. It would be seven months later when Menorah Medical Center would first identify the Tarlov Cysts; and would be almost two years later before my next set of MRI scans

were performed by The University of Kansas with the explicit instruction to fully identify all Tarlov Cysts by number, size, and location.

88. On February 9th, 2017, KU Interpreting Radiologist Judson Bertsch, MD reported findings which included only the statement "Small perineural sacral Tarlov cysts are unchanged." This impression was based upon comparison with prior MRI and X-ray results, also performed at The University of Kansas: **"Comparison is made with prior plain films and MRIs of the lumbar spine. The prior MRIs from April 8, 2014. Plain Films are from March 10, 2015"**

89. The February 9th, 2017 MRI was specially ordered via E Kay Carpenter, Nurse Practitioner at Neurosurgery Associates of South Kansas City - a Division of HCA Midwest Health; under the supervision of Dr. John A Clough, MD  to conform to the recommendations provided by Rita Honey-Heir of The Tarlov Cyst Foundation.

90. The explicit purpose of the MRI was to identify all Tarlov Cysts, by size and location, with sizes listed in three dimensions, and with locations to include the specific nerve roots affected by each cyst.

91. Diagnosing whether or not Tarlov Cysts are the cause of a patient's symptoms is impossible without the level of detail requested; and no attending physician would be capable of making an accurate diagnosis merely from the words **"Small perineural sacral Tarlov Cysts are unchanged."**

92. Furthermore, two prior series of MRI scans performed at Menorah Medical Center -- on October 15th, 2015 and May 9th, 2016 had recorded an increase in the size of the largest cyst from 8mm to 9 or 10mm over a six month period of time.

93. It is within the nature of Tarlov Cysts to increase in size intermittently when repeatedly traumatized and pressurized with cerebral spinal fluid over the course of many years.

94. Furthermore, the sacral foramina through which the sacral nerve roots exit the spine range in size from less than 5mm to over 1 centimeter. A 10mm cyst could be more than double the size of the foramen through which it exits; and could place intermittent pressure upon adjacent nerve roots as well. It is well established in the Tarlov Cyst literature that the mere size of a Tarlov Cyst bears no relation to whether or not the cyst will be symptomatic.

95. The history of symptoms which I have reported to my various doctors are a textbook example of the progression of Tarlov Cyst Disease: beginning with a lumbar and sacral trauma which caused herniated discs, lumbar strain, and back pain; then progressing to a mild stinging pain in the hips, numbness, tingling, and restless leg syndrome; escalating to intense stabbing pains through the penis and rectum; and all the while accompanied by bizarre and frightening stroke-like headaches -- known within the medical profession as "Thunderclap Headaches", the result of cerebral spinal fluid hypotension and leakage.

96. Regarding the extensive efforts to schedule and specifically order a "Tarlov Cyst" MRI; it was my original preference to have the MRI performed by Menorah Medical Center, as they were the only radiology practice to have identified the cysts on two of my four prior MRIs.

97. Ellen Kay Carpenter (Neurosurgery of South Kansas City) however, did not appear convinced that Tarlov Cysts could explain my symptoms; and I would later find that

she had written in my medical records that "He is focused on an idea that a tarlov
cyst is present and likely the cause of his issues. I did explain his last MRI did not
indicate any tarlov cysts and I am not sure the origin of his right leg issues,
incontinence.

98. My insurer at the time of the February 9th, 2017 MRI was Blue Cross and Blue
Shield, a subsidized health care plan purchased through the Health Insurance
Marketplace.

99. Menorah Medical Center, while listing that they accept Blue Cross and Blue Shield,
later informed me that they did not accept subsidized health care plans purchased
through the Health Care Marketplace; leaving me with only one single option for MRI
services -- that being The University of Kansas.

100.    Additionally, while E. Kay Carpenter had previously expressed the opinion that
Tarlov Cysts were not symptomatic; there were no neurosurgical practices in The
State of Kansas which acknowledge or treat Tarlov Cyst Disease; and a
neurosurgical referral was required to obtain approval for the MRI through Blue
Cross and Blue Shield.

101.    In other words, I literally had no other options but to utilize the services of
Neurosurgery Associates and The University of Kansas Medical Center; and this
was the motivation for requesting a letter from The Tarlov Cyst Foundation to specify
the type of MRI that I would require in order to seek a surgical consultation via one
of the two Tarlov Cyst Specialists in the nation performing surgeries on Tarlov Cysts
at that time.

102.   Among all hospitals in The State of Kansas, only The University of Kansas Hospital Authority and The University of Kansas Medical Center have a statutory mandate to provide medical care to the "medically indigent;" and to provide medical services which are not widely available elsewhere in The State.

103.   One two separate occasions, administrative staff with The University of Kansas Medical Center have informed me that they University of Kansas Medical Center is no longer a state hospital.

104.   Most prominently, Becky Moberg, who worked with me to specifically select Dr. Larry Cordell to perform services under The Worker's Compensation Act, declared that The University of Kansas Medical Center is no longer a state hospital and that **"most of our patients like it that way."**

105.   Most recently, on January 29th, 2019, I was denied medical care by Mission Family Health Care -- A wholly owned and operated practice of  The University of Kansas Health System -- despite having informed the University scheduling staff of my indigence at the time that the appointment was originally made.

106.   I subsequently contacted the Financial Aid department of The University of Kansas Health Systems and was directed to Supervisor Lucinda Duteau; who agreed to make further inquiries, before ultimately returning my call on Friday February 1st, 2019 and confirming that, it was her opinion and that of The University of Kansas Health Systems that they were not a State hospital; but would consider me for financial aid if the doctor at the clinic would affirm her opinion that my health care needs are urgent.

107.   Over the following weekend, February 2nd, 2019 through February 4th, 2019;
believing myself to have an urgent deadline in another pending case; plus various
home repair and household tasks which required urgent attention; I over-exerted
myself; unable to follow up with Mission Family Health Care in person -- which I
believed would be more beneficial than to attempt to discuss the complexities of the
financial aid situation over the telephone. While I do still intend to follow up with
Mission Family Health and to pursue financial aid through The University of Kansas
Health Systems; the statutes of limitations on numerous claims could expire at
midnight on February 11th, 2019; and those rights could be lost forever if an
immediate legal action is not commenced.

108.   The decision of most doctors to deny the truth about Tarlov Cyst Disease; and
the decisions of most doctors not to participate in worker's compensation; and the
decisions by many doctor and health care organizations not to accept health
insurance plans purchased through the Health Care Marketplace; and the decisions
of many doctors not to accept patients insured through KanCare and other states'
Medicaid programs are business decisions -- not subject to the rules of medical
malpractice.

109.   Additionally, doctors are rarely (if ever) involved in scheduling functions within
their practices. These functions are handled by administrative (business) staff
members.

110.   Frequently, with many patients -- literally with millions of patients -- a patient will
share information with appointment schedulers such as that they are suffering from a
work related injury, and require a second opinion; or that they are insured through a

subsidized plan through the Health Insurance Marketplace; or that they are a KanCare or Medicaid consumer; or that they are seeking consultation regarding Tarlov Cyst Disease.

111.    Scheduling staff rarely share the information with the patient at the time of scheduling on whether or not their supervising physicians have animosity towards worker's compensation, ObamaCare, Medicaid, KanCare, or disability benefits.

112.    Scheduling staff never share information with the patient at the time of scheduling on whether or not their supervising physicians have knowledge regarding Tarlov Cyst Disease, have successfully treated patients with Tarlov Cyst Disease, or even know or believe in the modern medical science of Tarlov Cyst Disease.

113.    In fact, administrative staff at health care providers are almost universally taught the exact same response to provide when a patient or prospective patient asks a qustion about a specific disease: "I am not medical staff;" "I do not have medical training;" or some such variant upon the same theme.

114.    The only way to discover if a doctor has any one of these very common prejudices or predispositions is to schedule an appointment with the doctor, pay a fee in advance of service, and suffer through the abusiveness and neglect of an agitated or even angry physician...then try to find a different doctor, once again, with no access to the information on whether or not that doctor believes in Tarlov Cyst Disease, is willing to perform a worker's compensation related examination, is willing to treat Medicaid/ KanCare and ObamaCare / Health Insurance Marketplace consumers with dignity and respect; and is not prejudiced against people with

"chronic back pain" as to their being suspected drug addicts, doctor shoppers, malingerers, or frauds.

115.   All of these specified prejudices have at their core business related decisions made by physicians; relating to one or both of two considerations: 1) the difficulty of receiving payments from worker's compensation, ObamaCare, and Medicaid insurers; 2) The risks of medical malpractice litigation and/or litigation burdens inherent in providing services to injured workers. In other words: 1) payment considerations; 2) legal considerations.

116.   Medical considerations and the actual health of the patient always suffer when a doctor or health care providers possesses these prejudices, and reflects these prejudices in poor quality of service; up to and including neglecting to inform patients of potentially crippling or even life threatening diseases such as Tarlov Cyst Disease, and even cancer.

117.   These prejudices and their manifestations in substandard health care services affect not only the poor, and not only those with Tarlov Cyst Disease; but also millions of people with other, so-called "Invisible Diseases" such as Cauda Equina syndromes, fibromyalgia, Crohn's Disease, Celiac Disease,

118.   These prejudices also aggravate and exacerbate mental illnesses; as well as subjecting those with mental illness to substandard levels of physical health care services. Within this context, even actual opiod drug addicts (as contrasted with suspected opiod drug addicts) are denied their rights to competent, caring, and professional health care.

119.   Drug addiction is a diagnosed and classified mental illness; also protected by state and federal laws which prohibit discrimination against the disabled, and against any person based upon the diseases with which they are aflicted.

120.   Furthermore, drug addiction can only be cured with medical intervention; and it is doctors to whom drug addicts must turn for help. The abusiveness and cruelty of health care providers towards those suspected of being opiod addicts contributes substantially and significantly to the nationwide opiod epidemic; by deterring those who desire treatment and cure for their addictions from seeking medical assistance.

121.   Simply stated, no one wants to be abused. Many drug addicts have turned to drug use and eventually to drug abuse as a way of escaping physical and mental abuse in other areas of their lives. Abusive doctors, nurses, and administrative staff are the number one reason that most drug addicts do not seek treatment for their addictions.   Being abused by a doctor just makes them want to medicate their physical and psychological pain even further.

122.   Most doctors do not care if drug addicts go kill themselves. To the majority of doctors, and based upon my observations and experience with a statistically significant number of physicians, nurses, mental health professionals, and administrative health care personnel; the majority of people within the health care industry literally hate suspected drug addicts; and are agressive, cruel, and at times even violent in getting "these people" out of their offices and emergency rooms; with no desire nor compassion for treating the diseases, both physical and mental, that suspected opiod addicts may suffer.

123.    These abusive and negligent health care practices lead not only to continuing addiction and other mental health issues; but also to the development of new addictions and mental health issues; including being a leading cause of opiod addiction; a major contributing cause to opiod overdose deaths; and a major contributing cause to suicides, family instability, job loss, economic as well as health care disenfranchisement, consumer debt collections, bankruptcies, and countless other social ills.

124.    I apologize again for the incomplete and "rambling" nature of this pleading; as I am severely limited in the amount of time that I can spend typing in any sitting; and have repeatedly had to start and stop again, literally over the course of three years to attempt to draft a comprehensive pleading which would address all of the legal and medical issues of which I am a victim. I have given up, for all practical purposes on the belief that I can draft a sufficient pleading; yet I still require medical care as well as access to justice to secure my rights to medical care and relief. And I am forced into the practice of filing multiple small pleadings in advance of expiring Statutes of Limitations, and to hope for my ability to amend the pleadings to secure my rights going forward, literally with the rest of my life.

125.    All of the allegations of this pleading are true, though incomplete; and supportable with documentation, witness testimony, and other substantial competent evidence. I file this pleading, as I file all pleadings, in good faith; with the assurance that my rights are justly founded upon the facts and the law.

**COUNT I - AMERICANS WITH DISABILITIES ACT VIOLATIONS - ALL PHYSICIANS AND HEALTH CARE PROVIDERS**

126.   Nationwide, persons with Tarlov Cyst Disease are not only being systematically denied access to medical care specific to our needs; many are systematically disenfranchised from all access to medical as a result of ongoing, escalating, and unacknowledged disability.

127.   Both the University of Kansas Hospital (including all of its affiliated doctors and practices) and Neurosurgery of South Kansas City refuse to provide medical services appropriate to persons with Tarlov Cyst Disease.

128.   Additionally, the University of Kansas Hospital and Neurosurgery of South Kansas City actively concealed the presence of Tarlov Cysts, even when the presence of these cysts had previously been observed and confirmed on MRI scans which were available to all doctors at both health care service providers.

129.   In addition to denying the presence and relevance of Tarlov Cyst Disease; doctors and practitioners at both The University of Kansas Hospital and at Neurosurgery of South Kansas City recorded false information within my medical records and diagnoses of mental illness -- specifically of exaggerated, faked, or psychosomatic symptoms -- which were based entirely upon their own misstatements of the factual background of my disability and of the insurance fraud of which I am a victim.

130.   Incorporating all allegations above and below; the acts and practices of The University of Kansas Hospital and Neurosurgery of South Kansas City have had the effect of perpetuating my physical pain, escalating my disability, and disenfranchising me from all access to medical care; potentially for the remainder of my life.

131.   It is possible, if not likely, that the extended delay in access to appropriate medical care may have already resulted in permanent nerve damage; and has already resulted in irreparable damage to my life and to my family

132.   The scientific evidence clearly indicates that Tarlov Cysts and Tarlov Cyst Disease are a much more common cause of disability than is acknowledged by private and public health care suppliers.

133.   This scientific evidence includes a case study published by the former director of The University of Kansas Hospital's own Comprehensive Spine Care Center, Dr. Paul Arnold; which details the successful surgical treatment of two patients with Marfan Syndrome and sacral perineural cysts and symptoms similar to those which I have demonstrated over the course of the past seven years.

134.   In addition to refusing to provide services for patients with Tarlov Cyst Disease, the University of Kansas refuses to provide training to future health care providers on the proper diagnosis and treatment of Tarlov Cyst Disease.

WHEREFORE Plaintiff seeks

1. Declaratory Judgment that The University of Kansas Hospital Authority, The University of Kansas Hospital, The University of Kansas Medical School, The University of Kansas Physicians, and all individual physicians who have participated or refused to participate in the provision of my health care have violated the Americans with Disabilities Ac.

2. That the same parties are engaged in ongoing violations of the Americans With Disabilities Act with respect to all persons with Tarlov Cyst Disease.

3.  Injunctive relief prohibiting future violations of The Americans with Disabilities Act relative to patients with Tarlov Cyst Disease.

4.  Orders to The University of Kansas Hospital Authority and all personnel and health care suppliers under their supervision to institute proper procedures for the training of personnel regarding Tarlov Cyst Disease, and for the proper diagnosis and treatment of all persons with Tarlov Cyst Disease.

5.  Such other relief as may be deemed just and proper by the court.

-----------------------------------------------------------------------------------------------------------------

## COUNT II - BREECH OF CONTRACT - ALL PHYSICIANS AND HEALTH CARE PROVIDERS

135.   Incorporating all factual allegations above and below;

136.   All named parties have breeched their contracts for the provision of health care services appropriate for a person afflicted with Tarlov Cyst Disease.

137.   As a person afflicted with Tarlov Cyst Disease, and with a long history of symptoms attributable to Tarlov Cysts affecting sacral and adjacent nerve roots; I have been consistently and universally denied the medical diagnostics and treatments  to which I was entitled under my contracts with all health care services suppliers.

138.   In addition to being denied the services required due to my particular injury, disease, and to the formation of Tarlov Cysts; On numerous occasions (as detailed above) I have been denied all services by health care providers; and received only explanations of their reasons for denying services; rather than the health care services for which I contracted.

139.   The long term denial of health care services appropriate for the treatment of my

particular disease and disability has resulted in financial damage, dissolution of my

family, long-term and possibly permanent unemployment, disenfranchisement from

all access to medical care, and the inability to receive either privately contracted or

government sponsored disability benefits.

WHEREFORE Plaintiff seeks

1.   Declaratory judgment that all named health care providers have breeched their
     contracts for the provision of health care services.
2.   Correction of all medical and billing records relative to the breeched contracts for
     services.
3.   Damages including punitive damages in excess of $75,000
4.   Such other relief as may be deemed just and proper by the court.

-------------------------------------------------------------------------------------------------------

**140.   COUNT III - KANSAS CONSUMER PROTECTION ACT, RE. TARLOV CYST**
     **DISEASE - ALL PHYSICIANS AND HEALTH CARE SUPPLIERS**

141.   Incorporating all factual allegations above and below;

142.   The refusal and failure to acknowledge, diagnose, and treat Tarlov Cyst Disease

is a business decision; made by physicians and health care service providers based

upon assessments of potential liability for iatrogenic harms; and not based upon

modern medical science which demonstrates the safety and effectiveness of

treatments for Tarlov Cyst Disease.

143.  Additionally, many health care providers actively conceal Tarlov Cyst Diagnoses; not only with the intention of evading responsibility to treat the disease; but also with the intention of actively concealing prior acts of malpractice and misdiagnosis by themselves or by colleagues.

144.  I am a consumer of health care services, contracted with all named parties for the rendering of health care services.

145.  I am aggrieved by all policies regarding the treatment and diagnosis of persons with Tarlov Cyst Disease.

146.  I have suffered harms in excess of $75,000 as a result of the refusal of health care providers to provide proper diagnosis and treatment of Tarlov Cyst Disease.

147.  I am a disabled consumer, and thus a protected consumer under the standards established in K.S.A. 50-676 et. seq.; thus entitled to seek both civil penalties under The Kansas Consumer Protection Act and Enhanced Civil Penalties under the Kansas Consumer Protection Act.

148.  The acts alleged herein were intentional, deceptive, and unconscionable under the definitions provided within the Kansas Consumer Protection Act

WHEREFORE Plaintiff seeks the following relief

1.  Declaratory Judgment that the defendants have violated the Kansas Consumer Protection Act by failing and refusing to properly diagnose and treat Tarlov Cyst Disease.

2.  Declaratory Judgment that the defendants have actively concealed Tarlov Cyst Disease from this plaintiff; and from all patients diagnosable with Tarlov Cyst Disease.

3.  Declaratory Judgment that the defendants' acts and practices are ongoing in nature; both as to the allegation that the practices are deceptive and unconscionable.

4.  The greater of damages or Civil penalties and enhanced civil penalties not to exceed $21,900,000 pursuant to The Kansas Consumer Protection Act.

5.  Such other relief as may be deemed just and proper by the court.

**149.  COUNT IV - KANSAS CONSUMER PROTECTION ACT, RE. WORKER'S COMPENSATION SERVICES - ALL PHYSICIANS AND HEALTH CARE SUPPLIERS**

150.  Incorporating all factual allegations above and below;

151.  The refusal and failure of physicians and health care suppliers to provide services, and to provide competent services to persons who have been injured at work is a business decision.

152.  I am a consumer of health care services, contracted with all named parties for the rendering of health care services.

153.  I am aggrieved by all policies regarding the refusal of health care providers to provide services to injured workers, particularly as said health care providers had no way of determining in advance if the Division of Worker's Compensation had legal jurisdiction over my health care and disability claims.

154.  Numerous physicians as detailed above have rendered intentionally negligent, incorrect and at times abusive medical care as a direct result of their opposition to

the Worker's Compensation Act; and their refusal to participate in worker's compensation..

155.   I have suffered harms in excess of $75,000 as a result of the refusal of health care providers to provide proper diagnosis and treatment of my disability often on the express explanation that they do not desire to participate in the provision of care for a work-related injury.

156.   I am a disabled consumer, and thus a protected consumer under the standards established in K.S.A. 50-676 et. seq.; thus entitled to seek both civil penalties under The Kansas Consumer Protection Act and Enhanced Civil Penalties under the Kansas Consumer Protection Act.

157.   The acts alleged herein were intentional, deceptive, and unconscionable under the definitions provided within the Kansas Consumer Protection Act

WHEREFORE Plaintiff seeks the following relief

1. Declaratory Judgment that the defendants have violated the Kansas Consumer Protection Act by failing and refusing to properly diagnose and treat injured workers, irrespective of the legal jurisdiction of The Division of Worker's Compensation over their claims.

2. Declaratory Judgment that the defendants have actively concealed the true nature and extent of my disability with the intention of depriving me of medical care and benefits which may have been available either via OnForce's worker's compensation insurers; or via my contract for services and insurance benefits with OnForce.

3. Declaratory Judgment that the defendants' acts and practices in refusing to perform services for injured workers, in providing incompetent and often abusive care to injured workers, and in falsely and at at times maliciously misdiagnosing injured workers; are ongoing in nature; both as to the allegation that the practices are deceptive and unconscionable;.

4. The greater of damages or Civil penalties and enhanced civil penalties not to exceed $21,900,000 pursuant to The Kansas Consumer Protection Act.

5. Such other relief as may be deemed just and proper by the court.

-------------------------------------------------------------------------------------------------

158. **COUNT V - KANSAS CONSUMER PROTECTION ACT, RE: INDIGENT, POOR, SUBSIDIZED HEALTH CARE CONSUMERS - ALL PHYSICIANS AND HEALTH CARE SUPPLIERS**

159. Incorporating all factual allegations above and below;

160. The refusal and failure of physicians and health care suppliers to provide services, and to provide competent services to persons who are indigent, who are on Medicaid / KanCare or Medicare; or who are insured via private health insurance policies obtained via the Health Care Marketplace under The Affordable Care Act is a business decision.

161. Additionally, many health care providers actively engage in abusive and negligent medical care directed against those who are indigent or whose health care benefits are subsidized via the Affordable Care Act, or who receive their health care benefits via programs such as Medicaid / KanCare..

162.    I am a consumer of health care services, contracted with all named parties for
        the rendering of health care services.

163.    I am aggrieved by all policies regarding the treatment and diagnosis of medically
        indigent persons; and of persons insured through the Health Care Marketplace..

164.    I have suffered harms in excess of $75,000 as a result of the the allegations
        made herein.

165.    I am a disabled consumer, and thus a protected consumer under the standards
        established in K.S.A. 50-676 et. seq.; thus entitled to seek both civil penalties under
        The Kansas Consumer Protection Act and Enhanced Civil Penalties under the
        Kansas Consumer Protection Act.

166.    The acts alleged herein were intentional, deceptive, and unconscionable under
        the definitions provided within the Kansas Consumer Protection Act

WHEREFORE Plaintiff seeks the following relief

1.  Declaratory Judgment that the defendants have violated the Kansas Consumer
    Protection Act by failing and refusing to properly diagnose and treat medically
    indigent and subsidized health care consumers..

2.  Declaratory Judgment that the defendants' acts and practices are ongoing in
    nature; both as to the allegation that the practices are deceptive and
    unconscionable.

3.  The greater of damages or Civil penalties and enhanced civil penalties not to
    exceed $21,900,000 pursuant to The Kansas Consumer Protection Act.

4.  Such other relief as may be deemed just and proper by the court.

-------------------------------------------------------------------------------------------------

## COUNT VI - TORTIOUS INTERFERENCE WITH CONTRACT - ALL PHYSICIANS AND HEALTH CARE SUPPLIERS

**167.** NOTICE OF INTENT TO SUPPLEMENT AND AMEND THE PLEADINGS TO INCLUDE TORTIOUS INTERFERENCE WITH HEALTH CARE AND INSURANCE CONTRACTS, AND TORTIOUS INTERFERENCE WITH CONTRACTS BETWEEN PLAINTIFF AND ONFORCE.

## COUNT VII - LIBEL / SLANDER / INTENTIONAL AND OR NEGLIGENT INFLICTION OF MENTAL ANGUISH AND EMOTIONAL DISTRESS - ALL PHYSICIANS AND HEALTH CARE SUPPLIERS

**168.** NOTICE OF INTENT TO SUPPLEMENT AND AMEND THE PLEADINGS TO INCLUDE ALLEGATIONS OF LIBEL / SLANDER / AND INTENTIONAL INFLICTION OF MENTAL ANGUISH AND EMOTIONAL DISTRESS.

**169. COUNT VIII - ALL RELIEF TO WHICH THE PLAINTIFF IS ENTITLED WHETHER ASKED FOR IN THE PLEADING OR NOT**

170.   Incorporating all allegations of fact above and below:

171.   Pursuant to Rule 54(c), "Every other final judgment should grant relief to which each party is entitled, even if the party has not demanded that relief in its pleadings

WHEREFORE, Pursuant to Rule 54(c) Plaintiff requests the following relief:

1. All relief to which the plaintiff is entitled according to the facts alleged, and according to the law as it exists at the time of the alleged violations.

2.  Leave to amend the pleadings, even after judgment, to conform with the rules of procedure as recording in Kansas Statutes Chapter 60

3.  All other relief which the court may deem just and proper.

COUNT IX - MEDICAL MALPRACTICE

172.   Incorporating all allegation above;

173.   The persistent failure and refusal to treat and diagnose Tarlov Cyst Disease according to modern medical standards constitutes medical malpractice committed against all persons with Tarlov Cyst Disease.

174.   Plaintiff has been harmed financially, physically, psychologicall, and emotionally by the persistent refusal of health care suppliers; including without limitation those named herein; to properly diagnose and treat Tarlov Cyst Disease.

175.   The standards of care for Tarlov Cyst Disease are well established in the scientific literature and hundreds of available case studies.

176.   The doctors named herein have persistently failed to properly diagnose Tarlov Cyst Disease; even after the presence of the disease was revealed via medical imaging.

WHEREFORE, Plaintiff requests the following relief

1.  Orders to arrange for a Medical Panel review of all acts and practices alleged herein.

2.  Declaratory judgment that the acts and practices alleged herein constitute medical malpractice.

3.  All relief to which the plaintiff may be entitled according to the law and facts of
    the case; including damages in excess of $75,000

Seeking declaratory, injunctive, damages, and punitive relief in excess of $75,000

re ADA Denials of Service, breech of contract, intentionally inflicted pain/suffering

and KCPA Enhanced Civil Penalties for up to $21,900,000 ongoing practices.

V.   Do you claim the wrongs alleged in your complaint are continuing to occur at the
present time? Yes ☒   No ☐

VI.   Do you claim actual damages for the acts alleged in your complaint?
Yes ☒   No ☐

VII.   Do you claim punitive monetary damages?   Yes ☒   No ☐

If you answered yes, state the amounts claimed and the reasons you claim you are entitled
to recover money damages.

I am seeking in excess of $75,000 in monetary damages plus punitive damages,

civil penalties arising from the perpetuation and escalation of Tarlov Cyst Diseas

e symptoms, seven years of perpetuated pain, mental anguish and emotional

distress, disenfranchisement for employment, disenfranchisement from medical

care, family instability, loss of consortium, interference with insurance and work

contracts;& to forestall imminent harms: nerve damage, disability, homelessness

4

VIII.   Administrative Procedures:

A.      Have the claims which you make in this civil action been presented through any type of Administrative Procedure within any government agency? Yes ☒  No ☐

B.      If you answered yes, give the date your claims were presented, how they were presented, and the result of that procedure:

A worker's compensation claim was docketed in The State of Kansas

absent legal jurisdiction by attorneys Matthew Bretz & Melinda Young; wh

subsequently withdrew representation without request for benefits. cont...

C.      If you answered no, give the reasons, if any, why the claims made in this action have not been presented through Administrative Procedures:

IX.   Related Litigation:

Please mark the statement that pertains to this case:

☑      This cause, or a substantially equivalent complaint, was previously filed in this court as case number _____ and assigned to the Honorable Judge _____.

☐      Neither this cause, nor a substantially equivalent complaint, previously has been filed in this court, and therefore this case may be opened as an original proceeding.

Signature of Plaintiff

Scott B. Sullivan
Name (Print or Type)

7214 W 71st Terrace
Address

5

Overland Park, KS 66204
_____
City          State          Zip Code

(913) 265-5949
_____
Telephone Number

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates { ☐ Wichita, ☒ Kansas City , or ☐ Topeka} , Kansas as the
(Select One)
location for the trial in this matter.

_____
Signature of Plaintiff

## REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury { ☒ Yes or ☐ No }
(Select One)

_____
Signature of Plaintiff

Dated: 02/11/2019
(Rev. 10/15)

6